# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| Guidry | Civil Action No. 17-01492 |
| Versus | Magistrate Judge Carol B. Whitehurst |
| Epic Diving & Marine Services LLC | By Consent of the Parties |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by Defendant, Epic Diving & Marine Services, LLC ("Epic") [Rec. Doc. 31], Plaintiff, Frederick J. Guidry's, Memorandum in Opposition [Rec. Doc. 38] and Epic's Reply [Rec. Doc. 42].[1] For the reasons that follow, the Motion will be denied.

## I. FACTUAL BACKGROUND

The record provides that at the time of the incident, September 19, 2016, Plaintiff was employed by Epic as a nighttime Engineer aboard the M/V EPIC EXPLORER. The M/V EPIC EXPLORER is a dive support vessel that was engaged in saturation diving operations in the Gulf of Mexico. It is undisputed that Mr. Guidry was a Jones Act seaman and contributed to the mission of the M/V EPIC EXPLORER.

---

[1] The Court notes that Epic filed its reply on August 27, 2019, 12 days after the Plaintiff's opposition was filed on August 15, 2019. The Court's order of Motion Setting, *R.36,* provides that leave of court to file a reply must be done "within ten (10) calendar days after the memorandum in opposition is filed." The record does not indicate any extension was granted. Counsel for Epic is admonished that such future tardiness may be subject to denial of leave to file.

1

Prior to going to work aboard the M/V EPIC EXPLORER, Plaintiff was directed by Epic to submit to a merchant mariner physical examination by Dr. Mark Freeman in order to be approved for employment. Mr. Guidry informed Dr. Freeman and his staff that he was diagnosed with high blood pressure and that he took blood pressure medication on a regular basis. *R. 38-3, Exh. C, pp. 5-6.* Following completion of the physical, Dr. Mark Freeman certified that Mr. Guidry was fit for duty.

Plaintiff began his work day on September 19, 2016, at 6:00 p.m. He performed his normal and routine duties, including performing engine room checks, lock-out/tag-out procedures, and starting the engines for use of the four-point anchor systems. *R. 38-8, Exh. H, Depo. Of Plaintiff, pp. 59-60, 134-136.* Following the setting of the four-point anchors, Guidry reported to the engine room area to change the oil in the port dive generator. *Id. at p. 136.* The deposition testimony of two crewmembers, Ora Perkins and Roy Evans, who were working with Plaintiff provides that when all power is on and there is ventilation the temperature in the engine room is normally around 90 to 110 degrees. *R. 38-6, Exh. F, Depo. Of Perkins, pp. 37-39; R. 38-7, Exh. G, Depo. Of Evans, pp. 90-91.* Perkins further stated that when the blowers are out or in case of a power failure, the temperatures can go from "150 to 200 real quick"— in a few minutes. *R. 38-6, p. 38.*

On that day, Plaintiff was working in the engine room environment with the ventilation working. In order to change the oil, he reached for a stack of oil absorbent pads that had been placed by other crew members on top of a main electrical panel located in the engine room. These oil absorbent pads had been weighted down by other crew members with a 2 to 3 inch stainless steel coupling in order to prevent the oil absorbent rags from blowing around during the engine ventilation. *R. 38-6, pp. 32-33; R. 38-7, pp. 50, 52-54*. As Plaintiff grabbed the oil absorbent pads, the coupling fell across the main electrical panel and into a cut out modification in the side of the electrical panel. Upon entering the main electrical panel, this metal coupling made contact with the bus bars causing a catastrophic power failure of ship lighting and ventilation. *R. 31-4, pp. 95-96, 109-110, 115*. This caused "blackout" conditions and an extreme temperature spike in the engine room where Mr. Guidry was working. *R. 38-3, Exh. D, Depo. Of Verrett, p. 40, R. 38-6, pp. 38-39*.

When the power went out, Plaintiff was required to remove the back panel in an attempt to restore power. This prevented him from being able to complete the oil change on the port dive generator, leaving dive support only on one generator. According to Guidry, the starboard dive generator had been having problems, making it imperative that the oil change be completed on the port dive generator at

the time the power went out.² *R. 38--8, pp.122-123*. Therefore, Plaintiff set about attempting to restore the power. He was assisted by Evans and Perkins. Both men confirmed not only the spike in temperature, but also that Guidry appeared to be sweating profusely and struggling physically during the blackout conditions. *R. 38--6, pp. 49-50; R. 38--7, pp. 66-67*. Captain Melvin Verrett testified in deposition that he had worked with Guidry on the vessel on approximately 1 ½ hitches and during that time Guidry never appeared to have any difficulties physically doing his job, including going up and down stairs on the vessel. *R. 38-4, pp. 38-40*. He stated that when he saw Guidry on the day of the incident he appeared healthy and able to do his job. *Id., pp. 38-39*. Other vessel workers confirmed that Guidry appeared to be able to do his job without difficulty. *R. 38-5, Exh. E, Depo. Of Dixon, pp. 15-16; R. 38-6, pp. 42-43; R. 38-7, pp. 16-17*.

After leaving the area where the repair work was being conducted, Plaintiff sat under a jet cooling fan and ultimately reported to the galley. *R. 31-4, p. 121*. While in the galley, he was conversing with Jimmy Marano, a medic aboard the ship, when he passed out. Marano checked for vital signs, determined that Guidry had no pulse and instituted CPR and emergency lifesaving procedures. After two (2) hits

---

² Plaintiff contends a discrepancy exists between the engine room logs, which identify the power loss at 2130, *R. 38-9*, and the dive logs, which identify the loss of power at 2247, *R. 38-10*. Epic argues that the power was out for "38 minutes, from 10:47 to 11:25 p.m. [2247 to 2325]." *R. 31-4, Depo. Of Plaintiff, Exh. G-4*.

4

from an AED device, Guidry regained consciousness and was ultimately transferred for medical care by helicopter to Texas. *R. 31-3, Deposition of Marano, pp. 49-57.*

After his release from the hospital, Plaintiff began treatment with Dr. Kevin Courville, a board certified cardiologist, in Lafayette, Louisiana on October 6, 2016. Dr. Courville performed a left heart catheterization and coronary stint on two (2) occasions. In addition, Dr. Courville was required to implant a defibrillator due to continued cardiac problems. Dr. Courville was deposed on October 10, 2018, as to his opinions and recommendations regarding Guidry, *R. 38-11, Depo Of Courville Exh. K,* and he submitted an Affidavit which is attached to Plaintiff's Opposition, *R. 38-1, Exh. A.*

Plaintiff filed this action under the Jones Act and general maritime law on November 13, 2017 contending he suffered an acute plaque rupture and myocardial infarction ("AMI") on September 19, 2016 while working for EPIC which were precipitated and contributed to by dangerous environmental conditions as well as from an unseaworthy condition and failure to provide a safe place to work aboard the *M/V EPIC EXPLORER*.

## II.  CONTENTIONS OF THE PARTIES

Epic contends that Guidry cannot bring a successful cause of action under the Jones' Act because he cannot establish that EPIC's negligence "caused the seaman's injury, in whole or in part." Epic argues that Guidry's pre-existing severe coronary

artery disease made him more susceptible to a spontaneous acute myocardial infarction ("AMI") at any time, without any external precipitating event such as he alleges. Epic further argues that it is just as likely that the AMI was caused by the stress of Guidry's "ordinary activities on the night of the event" including climbing stairs and carrying buckets of oil.

Plaintiff's argument as to causation is that crew members on board the *M/V EPIC EXPLORER* stated the Guidry was physically able to do his job and hours before the incident, Guidry appeared healthy and able to perform his job duties without difficulty. After the power outage, with the temperatures spiking, however, members of the crew noticed that Guidry was sweating profusely and "looking bad." Plaintiff maintains that, based on the foregoing observations, Dr. Courville's opinion is that the events of the blackout more likely than not were contributing and precipitating factors to Guidry's AMI. Plaintiff contends that because the opening into the electrical panel which allowed the intrusion of the metal coupling and ultimately caused the blackout conditions, was an unseaworthy condition that was a proximate cause of Plaintiff's injury, summary judgment is inappropriate.

### III. LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district

court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir.2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes XX, Inc.*, 109 F.3d 1070, 1074 (5th Cir.1997). When the moving party, has met its Rule 56(c) burden, the nonmoving party, cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir.2004).

## IV. ANALYSIS

Plaintiff alleges his AMI was caused by both Jones Act negligence for failing to provide a safe place to work and the existence of an unseaworthy condition. Defendant moves for summary judgment dismissing all of Plaintiff's claims on the ground that Plaintiff has failed to carry his burden to prove that his AMI was caused by the September 19, 2016 conditions and events on the *M/V EPIC EXPLORER*. The parties agree that an essential element of Guidry's negligence and unseaworthiness claims against Epic is medical causation.

7

"Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action, each involving separate standards of proof, causation, and review." *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). While Epic states the elements of Jones Act negligence it makes no negligence argument related to the facts in this case. Instead, Epic addresses only unseaworthiness, and then only the causation element. Presumably this is because of the more difficult standard of causation as to unseaworthiness. None-the-less, the Court will address both the negligence claim and the unseaworthiness claim as follows.

   A. *Jones Act Negligence and Unseaworthiness Causation*

"A seaman is entitled to recovery under the Jones Act ... if his employer's negligence is the cause, in whole or in part, of his injury." *Randle v. Crosby Tugs, L.L.C.*, 911 F.3d 280, 283 (5th Cir. 2018) (quoting *Gautreaux v. Scurlock Marine*, Inc., 107 F.3d 331, 335 (5th Cir. 1997) (*en banc*)). "An employer 'has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition.'" *Lett v. Omega Protein, Inc.,* 487 Fed. Appx. 839, 843 (5th Cir.2012). "The standard of causation in Jones Act cases is not demanding." *Gowdy v. Marine Spill Response Corporation*, 925 F.3d 200, 205 (5th Cir. 2019). The terms "slightest" and "featherweight " have been used to describe the reduced standard of causation between the employer's negligence and the

employee's injury. *Johnson v. Offshore Express, Inc*., 845 F.2d 1347, 1352 (5th Cir.1988). Indeed, a claim under the Jones Act requires only that employer negligence "played any part, even the slightest, in producing the injury." *Gowdy,* 925 F.3d. at 205.

Independent from a claim under the Jones Act, a seaman has a claim under the general maritime law for injuries caused by the unseaworthiness of a vessel. "Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Beech v. Hercules Drilling Co., L.L.C*., 691 F.3d 566, 570 (5th Cir. 2012). "There is a more demanding standard of causation in an unseaworthiness claim than in a Jones Act negligence claim." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). An unseaworthiness claim requires proximate causation, and "a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Id.*

Epic argues it is entitled to summary judgment as to Plaintiff's Jones Act negligence claim and his unseaworthiness claim. *R. 31*. Rule 56 states, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing whether a material factual dispute exists, the

Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the non-moving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "Because of the policy of providing an expansive remedy for seamen, submission of Jones Act claims to a [factfinder] requires a very low evidentiary threshold; even marginal claims are properly left for [factfinder] determination." *Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir. 1978).

Plaintiff contends that Epic's negligence included "modification of a main electrical panel" and "failure to maintain a proper seal to prevent intrusion of water, dust, and especially foreign objects from entering the electrical panel"—which he alleges occurred in this case. According to the undisputed facts, while Guidry was changing the oil in one of the vessel's generators, he reached onto the top of the main electrical panel to grab some absorbent pads. In doing so, he dislodged a metal union weighing 8-10 pounds placed there by other crew members to hold down the pads. The union rolled off the panel and contacted wires entering the back and side of the panel from overhead. Upon making contact with the wires, the power to the main engine room generator went out causing failure of ship lighting and ventilation thereby dramatically elevating the temperature in the engine room. After working under these conditions replacing a circuit breaker in the panel, Guidry went to the

galley to get a drink and cool off. At that time Guidry passed out, was given CPR, and was evacuated by helicopter to a hospital in Galveston. It was ultimately determined that Guidry had an AMI.

In this case, the summary judgment record suggests that a factfinder could reasonably find that Epic was negligent, and that Epic's negligent actions or inactions contributed to Guidry's injuries "in the slightest degree." The Court finds a reasonable factfinder could infer that cutting an opening into the electrical panel as well as the placement of a metal union on absorbent pads stored on top of the panel was negligent, and that this negligence caused the blackout which resulted in the poor ventilation and spiking temperature and lead to Guidry's AMI.

With respect to Plaintiff's unseaworthiness claim, Epic contends that Dr. Courville cannot say the stress Guidry may have experienced while working during the power outage situation more probably caused his heart attack as opposed to either a "spontaneous plaque rupture" or "ordinary work activities." Citing portions of Dr. Courville's deposition testimony, *R. 31-8, Depo Of Courville, Exh. F,* Epic states that because of the "severity of Guidry's preexisting coronary disease" "the most the treating cardiologist can say is that the acute plaque rupture could have been precipitated by workplace stress" but also "could have been spontaneous." *R. 31-1, p. 10.*

11

In his Opposition Memorandum, Plaintiff attaches the sworn Affidavit of Dr. Courville who states as follows:

> 7.
> It is my opinion that the presence of coronary artery disease does not necessarily mean a person would have a spontaneous plaque rupture and myocardial infarction.
>
> 8.
> It is well documented in medical litarature that stressful evironments, perfuse sweating, and an increase in adrenaline production are known to be contributing factors to acute plaque rupture causing myocardial infarction.
>
> 9.
> It is my opinion that if Mr. Guidry was exhibiting no symptoms prior to the blackout conditions existing on September 19, 2016, and the events described were, more likely than not, contributing and precipitating factors to the acute plaque rupture and myocardial infarction.

*R. 38-1, Affidavit of Courville.* These statements by Dr. Courville taken in context with Captain Verrett's testimony that Guidry appeared healthy and able to do his job hours before the incident, confirm that the excited conditions, rise in temperature, and environmental changes which resulted in Guidry sweating profusely, and "looking bad" could have "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *In re Crewboats, Inc.*, 2003 WL 21018858, at *2 (E.D.La.,2003) (citing 1 Thomas J. Schoenbaum, *ADMIRALTY AND MARITIME LAW*, § 6–25 at 347 (3d ed.2001). "[C]ausation under this

definition is still a fact-intensive inquiry, and summary judgment is similarly inappropriate at this time." *In re Crewboats, Inc.*, 2003 WL 21018858, at *2 .

Accordingly, the Court finds that Dr. Courville's sworn affidavit is more than mere speculation and is sufficient to create a material issue of fact as to medical causation. This is not a situation where there is a "complete absence of proof" of medical causation such that summary judgment is warranted. Defendant's motion is denied.

*B. Zone of Danger*

In the alternative, Epic contends that Plaintiff's recovery under the Jones Act is barred because his AMI was caused by "work-related stress outside the zone of danger." *Skye v. Maersk Line, Ltd.*, 751 F.3d 1262 (11th Cir. 2014) ("The Jones Act does not allow a seaman to recover for injuries caused by work-related stress because work-related stress is not a "physical peril[ ]."). Contrary to Epic's contentions, however, "courts have allowed recovery for heart attacks due to physical stress of some sort." *See Duet v. Crosby tugs*, 2008 WL 4657786 (E.D. La. 2008) (collecting cases). In *Smith v. Ithaca Corporation*, 612 F. 2d 215, 220 (5th Cir.1980)(overturned on other grounds) the Fifth Circuit held that the plaintiff's injury was compensable due to the Jones Act negligence and unseaworthiness where plaintiff suffered a heart attack during a Benzene release aboard a ship. In this case, Guidry claims his injury was caused by working in an environment of spiking temperature and poor

13

ventilation—a form of physical stress similar to that in *Smith*. Moreover, Dr. Courville's affidavit statements confirm that such an environment could have caused Guidry's AMI. The Court finds that Epic's alternative argument is without merit under the facts of this case.

## V. CONCLUSION

For the foregoing reasons, Epic Diving & Marine Services, LLC's Motion for Summary Judgment will be denied as to the issues of Jones Act negligence and unseaworthiness.

THUS DONE AND SIGNED this 6th day of September, 2019 at Lafayette, Louisiana.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE